1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

7  JORGE JAVIER RODRIGUEZ CABRERA,          Case No. 2:25-cv-01551-RFB-EJY

8                  Petitioner,                          **ORDER**

9          v.

10

11 JOHN MATTOS, *et al.*,

12                  Respondents.

13          Petitioner Jorge Javier Rodriguez Cabrera has filed a Petition for Writ of Habeas Corpus

14 ("Petition") pursuant to 28 U.S.C. § 2241, challenging the lawfulness of his detention at Nevada

15 Southern Detention Center in the custody Federal Respondents. For the following reasons, the

16 Court grants the Petition.

17

18 **I.    BACKGROUND**

19          The following legal framework under the Immigration and Nationality Act (INA) is

20 relevant to Petitioner's challenge to the lawfulness of his ongoing detention.

21      **A. Legal Background**

22          **i.  *Statutory Framework***

23              1.  Removal Proceedings Under §1229(a) and Detention Under § 1226

24          Removal proceedings under § 1229(a), the "usual removal process," involve an evidentiary

25 hearing before an immigration judge (IJ). Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103,

26 108 (2020). Section § 1226 of the INA provides that while removal proceedings are pending, a

27 noncitizen "on a warrant," "may be arrested and detained" and that the government "may release

28 the alien on bond . . . or conditional parole." 8 U.S.C. § 1226(a)(2); accord Thuraissigiam, 591

U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country").

"Section 1226 generally governs the process of arresting and detaining ... [noncitizens] already in the country pending the outcome of removal proceedings," including noncitizens who are "present in the country" despite being "inadmissible at the time of entry." Jennings v. Rodriguez, 583 U.S. 281, 288-89 (2018). "[O]nce inside the United States ... the default rule" is set forth in § 1226(a): "The Attorney General may issue a warrant for the arrest and detention of [a noncitizen] 'pending a decision on whether the [noncitizen] is to be removed from the United States.'" Id. at 288 (quoting § 1226(a)). Following the noncitizen's arrest, the Attorney General "may continue to detain" the noncitizen or "may release" the noncitizen on bond or "conditional parole." § 1226(a)(1)-(2).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." Jennings v. Rodriguez, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by a preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. Rodriguez Diaz v. Garland, 53 F.4th 1189, 1197 (9th Cir. 2022) (citing Matter of Guerra, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). If an immigration judge has determined the noncitizen should be released, DHS may not re-arrest that noncitizen absent a change in circumstance. See Panosyan v. Mayorkas, 854 F. App'x 787, 788 (9th Cir. 2021).

### 2. Expedited Removal and Mandatory Detention Under § 1225

While "§ 1226 applies to aliens already present in the United States," the INA also "authorizes the Government to detain certain aliens *seeking admission* into the country under §§ 1225(b)(1) and (b)(2)," and pursue expedited removal. Jennings, 583 U.S. at 303 (2018) (emphasis added). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, § 1225 authorizes "expedited removal." § 1225(b)(1).

Section 1225 also contains a provision that applies to applicants for admission not covered

by § 1225(b)(1). <u>Jennings</u>, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." § 1225(b)(2). Thus, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their standard removal proceedings under § 1229(a) are pending. This is in contrast to the default detention regime under § 1226(a) discussed above, which allows for discretionary release and review of detention through a bond hearing.

### 3.  Parole

As relevant here, ICE/DHS may choose to release a noncitizen seeking entry on parole, on a discretionary and case-by-case basis. Accordingly, a noncitizen who has been detained at the border may be paroled for humanitarian reasons, or to provide a significant public benefit. 8 U.S.C. § 1182(d)(5)(A). Parole under that section "shall not be regarded as an admission" of the noncitizen, and "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." <u>Id.</u> That Section's implementing regulations provide termination of parole is automatic "at the expiration of the time for which parole was authorized." 8 C.F.R. § 212.5(e)(1). However, where parole is automatically revoked, a noncitizen "shall again be released on parole" if their "exclusion, deportation, or removal order cannot be executed within a reasonable time," or in the opinion of a DHS official "the public interest requires that the alien be continued in custody." <u>Id.</u>, § 212.5(e)(2)(i). Special status applies to nationals of Cuba paroled into the United States. <u>Id.</u>, § 212.5(h)(1).

### ii.  *The Automatic Stay Under 8 C.F.R. § 1003.19(i)(2)*

Prior to 2001, detainees subject to discretionary detention under § 1226(a) who were granted bond by an IJ remained detained only if the BIA granted a request to stay the bond order. 8 C.F.R. § 1003.19(i)(2) (1998) (permitting the use of automatic stays only where the noncitizen was subject to a mandatory detention statute). In 2001, the Immigration and Naturalization Service

(now DHS) implemented an interim rule to expand its authority to issue automatic stays of IJs' custody decisions pending their appeal. See Executive Office for Immigration Review (EOIR), Review of Custody Determination, 66 Fed. Reg. 54909, 54910 (Oct. 31, 2001). The INS emphasized that the stay was "a limited measure," to be used only "where the Service determines that it is necessary to invoke the special stay procedure pending appeal." Id.

In 2006, the EOIR promulgated the final and current rule, which added the requirement that to preserve the automatic stay, the attorney for DHS must file with the notice of appeal a certification by a senior legal official under 8 C.F.R. § 1003.6(c). This certification requirement was added "to allay possible concerns that in some cases the automatic stay might be invoked . . . without an adequate factual or legal basis." See EOIR, Review of Custody Determination, 71 Fed. Reg. 57873, 57876 (Oct. 2, 2006). The regulation also sets forth a procedure by which DHS may request an emergency stay of an IJ's custody determination from the BIA, which initiates expedited preliminary review by the BIA to determine whether a stay is warranted based on the individual circumstances of the detainee and the merits of DHS' appeal. See 8 C.F.R. § 1003.19(i)(1).

### iii.   *The Government's New Mandatory Detention Policy*

On July 8, 2025, DHS issued a notice entitled "Interim Guidance Regarding Detention Authority for Applicants for Admission" to all ICE Employees.[1] The Notice indicated that DHS, in coordination with the Department of Justice, "revisited its legal position" on the INA and determined that Section 235, rather than Section 236, is the applicable immigration authority for any alien present in the United States "who has not been admitted. . . whether or not at a designated port of arrival."[2] Accordingly, "it is the position of DHS that such aliens are subject to [mandatory] detention under INA § 235(b) and may not be released from ICE custody except by INA § 212(d)(5) parole."[3] The Notice further provides "[t]hese aliens are also ineligible for a custody redetermination hearing ("bond hearing") before an immigration judge and may not be released for the duration of their removal proceedings absent a parole by DHS. For custody purposes, these

---

[1] See ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission, AILA Doc. No. 25071607 (July 8, 2025), https://perma.cc/5GKM-JYGX.
[2] Id.
[3] Id.

- 4 -

aliens are now treated in the same manner that 'arriving aliens' have historically been treated."[4]

In sum, this change in policy by DHS requires ICE employees to deem anyone intercepted in the U.S. and charged with being inadmissible an "applicant for admission seeking admission" under 8 U.S.C. § 1225(b)(2)(A). Such a determination subjects the individual to mandatory detention during removal proceedings under 8 U.S.C. § 1229(a) and deprives them of the due process protections under 8 U.S.C. § 1226(a), which include entitlement to a bond hearing by an IJ at the outset of their detention, unless they have been arrested, charged with, or convicted of certain crimes that require mandatory detention under 8 U.S.C. § 1226(c), and multiple levels of judicial review of that bond determination. See 8 C.F.R. §§ 1003.19(a), 1236.1(d).

This sweeping new policy subjects *millions* of undocumented residents to prolonged detention without the opportunity for release on bond, in contravention of decades of agency practice and robust due process protections hitherto afforded to such residents to enable them to challenge the government's basis for detaining them.[5] On September 5, 2025, the Bureau of Immigration Appeals (BIA) issued a precedential decision adopting this new interpretation of the government's detention authority under the INA. See Matter of Yajure Hurtado, 29 I&N Dec. 216 (BIA 2025) ("Hurtado"). After Hurtado, immigration judges no longer have authority to hear bond requests or grant bond to noncitizens present in the U.S. who entered without inspection. Id.

The overwhelming majority of district courts across the country, including this Court, that have considered the government's new statutory interpretation have found it incorrect and unlawful. See Maldonado Vazquez v. Feeley, 2:25-CV-01542-RFB-EJY, 2025 WL 2676082 (D. Nev. Sept. 17, 2025) (finding the statutory text and "canons of statutory interpretation, including the legislative history, regulations, and long history of consistent agency practice, as well as the doctrine of constitutional avoidance" demonstrate the government's new reading of § 1225(b)(2)(A) is likely unlawful); see also, e.g., Rodriguez v. Bostock, No. 3:25-CV-05240-TMC, 2025 WL 2782499 (W.D. Wash. Sept. 30, 2025) ("Every district court to address this question has

---

[4] Id.

[5] See Kyle Cheney & Myah Ward, Trump's new detention policy targets millions of immigrants. Judges keep saying its illegal., Politico (Sept. 20, 2025 at 4:00 p.m. EDT), https://www.politico.com/news/2025/09/20/ice-detention-immigration-policy-00573850, https://perma.cc/L686-E97L.

concluded that the government's position belies the statutory text of the INA, canons of statutory interpretation, legislative history, and longstanding agency practice.") (collecting cases).

Prior to <u>Hurtado</u>, IJs of the Las Vegas Immigration Court, in various cases before this Court, rejected DHS' new interpretation of § 1225(b)(2), and instead found jurisdiction under § 1226(a) over noncitizens like Petitioner who were arrested within the U.S., rather than at or near the border, and have resided within the country continuously for longer than two years (*i.e.*, noncitizens who are not subject to expedited removal proceedings under § 1225). <u>See</u>, <u>e.g.</u>, ECF No. 1 at 51 (order by IJ Baker declining to treat Petitioner as an applicant for admission under DHS' new reading and citing the district court's injunction against that reading in <u>Vazquez v. Bostock</u>, Case No. 3:25-cv-05420-TMC (W.D. Wash. 2022)); <u>Herrera v. Knight</u>, No. 2:25-CV-01366-RFB-DJA, 2025 WL 2581792, at *4 (D. Nev. Sept. 5, 2025) (wherein three separate Las Vegas IJs considered and rejected DHS' statutory interpretation and found jurisdiction over each petitioner under § 1226(a)); <u>Vazquez v. Feeley</u>, No. 2:25-CV-01542-RFB-EJY, 2025 WL 2676082, at *3 (D. Nev. Sept. 17, 2025) (similar); <u>Aparicio v. Noem</u>, No. 2:25-CV-01919-RFB-DJA, 2025 WL 2998098 (D. Nev. Oct. 23, 2025) (noting the automatic stay was being invoked systemically to override the individualized determinations of the Las Vegas Immigration Court that noncitizens should be released on bond).

In response, as here, DHS systemically filed a Form EOIR-43 to stay the IJs' bond release orders pending appeal to the BIA, based solely on DHS' post July 8th reading of §1225(b)(2), with no separate showing of individualized facts justifying continued detention such as danger or flight risk. <u>Id.</u>

**B. Petitioner Jorge Javier Rodriguez Cabrera**

Petitioner is a native and citizen of Cuba. On October 11, 2022, U.S. Border Patrol arrested him at or near Eagle Pass, Texas, immediately after he entered the country without inspection. ECF No. 23-2. On October 12, 2022, the Department of Homeland Security (DHS) granted Petitioner parole into the United States pursuant to Section 212(d)(5) of the Immigration Nationality Act (INA) (8 U.S.C. § 1182(d)(5)(A)), "for urgent humanitarian reasons and or significant public benefit," as enacted by regulation 8 C.F.R. § 212(d)(5). ECF Nos. 1, 33-1. The

decision was, according to DHS, "due to a lack of bed space." ECF No. 33-1. Petitioner's parole expired on December 12, 2022.[6] See ECF No. 23. at 6.

Petitioner has continuously resided in the U.S. for three years since he was first granted parole. He is the father of two lawful permanent resident children, ages 11 and 13. Id. He shares custody with his spouse, who is also a lawful permanent resident. Id. Although Petitioner and his spouse are separated, Petitioner plays an active role in raising his children, including picking them up from school, caring for them on weekends, and providing day-to-day support. Id. Petitioner has a stable residence in Henderson, Nevada. Id. He has no criminal history in the United States or abroad. Id.; ECF No. 29-2.

After completing the one-year physical presence requirement, on or around November 1, 2023, Petitioner filed a Form I-485 Application to Register Permanent Residence or Adjust Status, pursuant to the Cuban Adjustment Act. ECF No. 1. In January 2025, Petitioner's wife and children adjusted status under the Cuban Adjustment Act, confirming the family's eligibility and intent to lawfully reside permanently in the U.S. Id.

On July 21, 2025, Petitioner was arrested by DHS officers pursuant to an administrative warrant as part of a "targeted pick up," ECF No. 33-1, and taken into custody at NSDC. ECF No. 29-2. ICE commenced removal proceedings, charging Petitioner with being inadmissible under INA § 212(a)(6)(A)(i) (8 U.S.C. § 1182(a)(6)(A)(i)) as "an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General" and INA § 212(a)(7)(A)(i)(I) (8 U.S.C. § 1182(a)(7)(A)(i)(I)) as "an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act . . ." Id.

On August 11, 2025, Petitioner filed a request for custody redetermination before the Las Vegas Immigration Court.On August 14, 2025, IJ Glen Baker held a bond hearing and granted Petitioner release on bond in the amount of $2,500. At the hearing, DHS argued Petitioner was an

---

[6] The parties do not contest that Petitioner's parole automatically expired on this date but have not provide documentary evidence of the terms of Petitioner's parole, such as an executed Form I-94 (Arrival-Departure Record). See 8 C.F.R. 253.1(a).

"applicant for admission" under § 1225(b)(2)(A) and therefore not eligible for bond. ECF No. 33-1 at 8. In granting bond, IJ Baker found that Petitioner was detained under 8 U.S.C. § 1226(a), because he was not a recent entrant within the past two years and was not "apprehended near the U.S./Mexico border *since he applied for admission.*" See ECF No. 1 at 52-53 (emphasis added). IJ Baker further found Petitioner was neither a flight risk nor a danger to the community, based on his lack of criminal history, fixed address, family ties in the U.S., steady employment, and the fact that he was pursuing adjustment of status through his November 1, 2023 application. Id.

The same day, counsel for ICE filed a Form EOIR-43, invoking an automatic stay of IJ Baker's order pursuant to 8 C.F.R. § 1003.19(i)(2), pending appeal to the BIA. On August 21, 2025, DHS filed its Notice of Appeal with a certification by Chief Counsel of ICE, thereby preserving the automatic stay under 8 C.F.R § 1003.6(c)(1). See ECF No. 33-1. The regulatory stay will expire 90 days after the filing of the notice of appeal, on November 19, 2025, unless the BIA acts on the appeal before then.

The basis for DHS' appeal is that the IJ erred in granting Petitioner bond because he is an applicant for admission both under INA 212(d)(5) (8 U.S.C. § 1182(d)(5)) due to his parole having expired, and pursuant its new broad new reading of § 1225(b)(2) as mandating detention of all noncitizens who entered the country without admission or parole. ECF No. 33-1. In their briefing to the BIA, DHS acknowledged that this is a significant and recent departure from historical practice: "[u]ntil recently, DHS and the Department of Justice (DOJ) interpreted [§1226(a)] for aliens [present without admission or parole] and placed directly in [standard removal proceedings under 1229(a).]" Id. at 14-15. DHS also argued Petitioner was subject to § 1225(b)(2)(A) due to his initial parole into the country, because "an alien granted parole remains an applicant for admission." Id. at 24-25.

On September 9, 2025, IJ Baker issued his memorandum decision regarding the basis for his August 14, 2025 bond order. He stated, "the authority of the Immigration Judge to set bond has been superseded by the decision of the Board of Immigration Appeals in Matter of Yajure Hurtado, 29 I&N Dec. 216 (BIA 2025)." See ECF No. 29-1.

On October 2, 2025, Petitioner had an individual merits hearing on his application for

1    adjustment of status under the Cuban Adjustment Act wherein the IJ indicated his intent to grant

2    adjustment, and DHS indicated it would not appeal that decision, conditioned on the completion

3    of final security checks ("biometrics") within the following two weeks. ECF No. 27. The IJ

4    instructed DHS to notify him if the biometrics cleared prior to October 16, 2025, so that a final

5    order granting adjustment of status could be entered. Id. Because DHS has not finished processing

6    Petitioner's biometrics, the IJ has not yet issued its decision.

7         At the October 30, 2025 hearing on the instant Petition, Respondents' counsel indicated the

8    final decision on adjustment of status is anticipated to be issued by the IJ at a hearing scheduled

9    for November 14, 2025, such that removal proceedings would conclude, Petitioner would be

10   released from detention, and this case would become moot. However, on November 3, 2025,

11   Petitioner's counsel informed the Court that on October 31, 2025, DHS submitted evidence in

12   opposition to Petitioner's eligibility for relief under the Cuban Adjustment Act in immigration

13   court, which means there is a significant possibility removal proceedings will not be resolved by

14   the November 14th hearing, and Petitioner's detention will continue indefinitely. See ECF No. 35.

15

16   **II.    PROCEDURAL HISTORY**

17        On August 20, 2025, Petitioner commenced this action by filing a Petition for Writ of

18   Habeas Corpus under 28 U.S.C. § 2241, challenging the lawfulness of his ongoing detention

19   pursuant to the automatic stay under 8 C.F.R. § 1003.19(i)(2) as *ultra vires* (Ground I), and

20   violative of his procedural and substantive due process rights under the Fifth Amendment

21   (Grounds 2 and 3). ECF No. 1. Petitioner concurrently filed a Motion for Order to Show Cause

22   (OSC) pursuant to 28 U.S.C. § 2243. ECF No. 8.

23        Upon filing of this case, the Court ordered service of the Petition and set a briefing

24   schedule. ECF No. 14. The parties subsequently jointly agreed to extend the briefing schedule, due

25   to the scheduling of a hearing before an IJ of the merits of Petitioner's application for adjustment

26   of status under the Cuban Adjustment Act. ECF No. 21. The parties noted that if adjustment of

27   status were granted, this action could be rendered moot. Id. On October 2, 2025, Petitioner sought

28   an additional extension to file his reply based on the IJ's statement that he intended to grant

1    Petitioner a final order of adjustment of status on or before October 16, 2025. ECF No. 27. On

2    October 17, 2025, Petitioner filed his reply, indicating the case could become mooted by an

3    October 23, 2025 hearing before the IJ, but that would require DHS taking the necessary steps of

4    clearing biometrics. ECF No. 29. On October 30, 2025, the Court held a hearing on the Petition

5    and ordered Respondents to supplement the record with evidence that DHS filed the necessary

6    certification to preserve the automatic stay. ECF No. 34. Respondents filed a copy of the

7    certification, which was attached to DHS' August 21, 2025 Notice of Appeal. ECF No. 33.

8        At the hearing, the parties indicated the IJ's decision on adjustment of status had been

9    further delayed, and a decision was anticipated at the next scheduled hearing before the IJ on

10   November 14, 2025. Petitioner requested that the Court immediately grant the Petition and order

11   his release while his adjustment of status is finalized, while Respondents asserted the Court should

12   further delay its decision, because Petitioner would be granted status in a matter of weeks and

13   released from detention, which would then moot the Petition. However, on November 3, 2025,

14   Petitioner's counsel filed a "Notice of Developments Subsequent to October 30, 2025 Hearing."

15   ECF No. 35. The Notice informed the Court than on October 31, 2025, DHS submitted evidence

16   in opposition to Petitioner's application for relief under the Cuban Adjustment Act to the

17   immigration court, which means there is a significant possibility removal proceedings will not be

18   resolved by the November 14th hearing, and Petitioner's detention will continue indefinitely. Id.

19   Petitioner again urged this Court to imminently intervene. Id. The Court's Order follows.

20

21   **III.    LEGAL STANDARD**

22       The Constitution guarantees that the writ of habeas corpus is "available to every individual

23   detained within the United States." Hamdi v. Rumsfeld, 542 U.S. 507, 525 (2004) (citing U.S.

24   Const., Art I, § 9, cl. 2). "Its province, shaped to guarantee the most fundamental of all rights, is

25   to provide an effective and speedy instrument by which judicial inquiry may be had into the legality

26   of the detention of a person." Carafas v. LaVallee, 391 U.S. 234, 238 (1968) "The essence of

27   habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the

28   traditional function of the writ is to secure release from illegal custody." Preiser v. Rodriguez, 411

1    U.S. 475, 484 (1973).

2         A writ of habeas corpus may be granted to a petitioner who demonstrates that he is in

3    custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). Historically, "the

4    writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and

5    it is in that context that its protections have been strongest." I.N.S. v. St. Cyr, 533 U.S. 289, 301

6    (2001). Accordingly, a district court's habeas jurisdiction includes challenges to immigration-

7    related detention. Zadvydas v. Davis, 533 U.S. 678, 687 (2001); see also Demore v. Kim, 538 U.S.

8    510, 517 (2003). "The application for the writ usurps the attention and displaces the calendar of

9    the judge or justice who entertains it and receives prompt action from him within the four corners

10   of the application." Yong v. I.N.S., 208 F.3d 1116, 1120 (9th Cir. 2000) (citation omitted).

11

12       **IV.    DISCUSSION**

13       **A.  Jurisdiction**

14        As an initial matter, the Court has habeas jurisdiction to review Petitioner's challenge to

15   the lawfulness of his detention, because the relevant jurisdiction stripping provisions of the INA,

16   8 U.S.C. § 1252, do not apply.

17        Respondents assert that subsections (g), (b)(9), and (a)(5) preclude this Court's review. The

18   Court addresses each subsection in turn. In evaluating each provision, the Court is guided "by the

19   general rule to resolve any ambiguities in a jurisdiction-stripping statue in favor of the narrower

20   interpretation and by the strong presumption in favor of judicial review." Arce v. United States,

21   899 F. F.3d 796, 801 (9th Cir. 2018) (*per curiam*) (internal quotations and citations omitted).

22       **i.  *Section 1252(g)***

23        As to federal court proceedings, 8 U.S.C. § 1252(g), unless other laws provide jurisdiction,

24   strips all courts of jurisdiction to hear "any cause or claim by or on behalf of any alien arising from

25   the decision or action by the Attorney General to commence proceedings, adjudicate cases, or

26   execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). However, as

27   interpreted by the Supreme Court, this § 1252(g) applies "only to three discrete actions that the

28   Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases,

or execute removal orders." <u>Reno v. Am.-Arab Anti-Discrimination Comm.</u>, 525 U.S. 471, 482 (1999) (emphasis in original). Thus, § 1252(g) does not apply to "all claims arising from deportation proceedings." <u>Id.</u> Instead, "[t]he Supreme Court has given a 'narrow reading' to § 1252(g)." <u>Ibarra-Perez v. United States</u>, _ F.4th _, 2025 WL 2461663 at *6 (9th Cir. Aug. 27, 2025). As the Ninth Circuit recently affirmed, federal courts have "jurisdiction to decide a 'purely legal question' that 'does not challenge the Attorney' General's discretionary authority . . . even if the answer to that legal question . . . forms the backdrop against which the Attorney General later will exercise discretionary authority." <u>Id.</u> (quoting <u>United States v. Hovsepian</u>, 359 F.3d 1144, 1155 (9th Cir. 2004)).

Because Petitioner does not challenge ICE's decision to "commence" removal proceedings against him, nor the continued "adjudication" of his removability in immigration court, but rather challenges his detention without a bond hearing pending the resolution of those proceedings, § 1252(g) does not apply to this case. <u>Id.</u> at *6-7. Respondents' broad reading of § 1252(g) as insulating the lawfulness of Petitioner's detention from judicial review, based on the assertion that his detention "arises from the decision to commence [removal] proceedings against him," <u>see</u> ECF No. 23 at 11, "would lead to a result that is not contemplated in the statute and that has been disavowed by the Supreme Court." <u>Ibarra-Perez</u>, 2025 WL 2461663, at *7.

Moreover, in cases where a noncitizen challenges the Attorney General's arguably discretionary decision on a purely legal basis as a "violation [of] the Constitution" or "INA," courts have jurisdiction to review such decisions as "premised on a lack of legal authority." <u>Id.</u> at *8. In any case, because Petitioner challenges the lawfulness of his detention during the pendency of his removal proceedings, it is not a challenge to one of the "three discrete events along the road to deportation" that § 1252(g) applies to. <u>Reno</u>, 525 U.S. at 482. Section 1252(g) thus does not deprive this Court of jurisdiction.

### ii. *Section 1252(b)(9)*

Similarly, Respondents' argument that the Court lacks jurisdiction to hear Petitioner's challenge to his detention without a bond hearing under § 1252(b)(9) has been expressly rejected by the Supreme Court. <u>See</u> <u>Jennings</u>, 583 U.S. at 291-92. Section 1252(b)(9) limits judicial review

of any legal challenges "arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter [including §§ 1225 and 1226]" to judicial review of a final order of removal. 8 U.S.C. § 1252(b)(2). The Supreme Court in <u>Jennings</u> specifically rejected the government's broad "extreme" reading of "arising from" under § 1252(b)(9) as only allowing challenges to detention authority through an appeal of a final order of removal (*i.e.* after the period of detention under § 1225(b)(2) or § 1226(a) and (c) has ended)," because it would "make claims of prolonged detention effectively unreviewable." <u>Id.</u> at 293 ("By the time a final order of removal was eventually entered, the allegedly excessive detention would have already taken place. And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review.") <u>Id.</u> Section 1252(b)(9) thus does not deprive this Court of jurisdiction.

### iii.  *Section 1252(a)(5)*

Likewise, is well settled that § 1252(a)(5) only strips a district court of habeas jurisdiction where a petitioner seeks judicial review of a final order of removal. <u>See</u> <u>Singh v. Gonzales</u>, 499 F.3d 969, 977-78 (9th Cir. 2007) (citing <u>Puri v. Gonzales</u>, 464 F.3d 1038, 1041 (9th Cir. 2006)) (holding that "the REAL ID Act's jurisdiction-stripping provisions ... does [sic] not apply [if the] claim is not a direct challenge to an order of removal") (emphasis added). Because there is no final order of removal issued as to Petitioner, and Petitioner does not challenge any order of removal, § 1252(a)(5) does not strip this Court of jurisdiction over his challenge to the lawfulness of his detention under the INA and Constitution.

### B.  Administrative Exhaustion

Next, the Court addresses Respondents' assertion that the Court should require Petitioner to await the BIA's resolution of DHS' appeal before resolving this Petition, *i.e.* require Petitioner to exhaust his administrative remedies.  "Exhaustion can be either statutorily or judicially required. If exhaustion is required by statute, it may be mandatory and jurisdictional, but courts have discretion to waive a prudential requirement." <u>Laing v. Ashcroft</u>, 370 F.3d 994, 998 (9th Cir. 2004). Neither the habeas statute, 28 U.S.C. § 2241, nor the relevant sections of the INA require Petitioner to exhaust administrative remedies before filing his petition for habeas corpus. <u>Id.</u> (citing

1    Castro-Cortez v. INS, 239 F.3d 1037, 1047 (9th Cir. 2001)). Therefore, the Court must exercise

2    its discretion to determine whether exhaustion should be required as a prudential matter. Id.

3        A court may require prudential exhaustion if: "(1) agency expertise makes agency

4    consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of

5    the requirement would encourage the deliberate bypass of the administrative scheme; and (3)

6    administrative review is likely to allow the agency to correct its own mistakes and to preclude the

7    need for judicial review." Puga v. Chertoff, 488 F.3d 812, 815 (9th Cir. 2007). Courts may however

8    waive prudential exhaustion if "administrative remedies are inadequate or not efficacious, pursuit

9    of administrative remedies would be a futile gesture, irreparable injury will result, or the

10   administrative proceedings would be void." Laing, 370 F.3d at 1000. Petitioner bears the burden

11   of demonstrating at least one of the Laing factors applies. See Ortega-Rangel v. Sessions, 313

12   F.Supp.3d 993, 1003 (9th Cir. 2018).

13       First, the Court finds it would be nonsensical to require Petitioner to await the BIA's

14   resolution of DHS' appeal under the doctrine of prudential exhaustion. Petitioner has exhausted

15   his administrative remedies—he sought review of his custody from an IJ pursuant to the procedural

16   protections he is afforded under § 1226(a) and successfully established that he should be released

17   on bond. The Petition asks this Court to enforce the IJ's bond order—requiring Petitioner to appeal

18   to the BIA to affirm the IJ's order that he contends was legally and factually correct would be

19   irrational. In other words, it is Respondents, not Petitioner, who claim the administrative remedial

20   scheme produced a mistaken outcome. The doctrine of prudential exhaustion is thus not implicated

21   where DHS—not Petitioner—is the party asking the BIA to overturn the IJ's determination.

22       Moreover, the Court finds exhaustion would be futile. In Hurtado, the BIA adopted the

23   Trump administration's new reading of the INA—unsurprisingly, as the BIA is overseen by the

24   DOJ, and the DOJ announced this new statutory interpretation, in conjunction with DHS, in July.

25   Accordingly, that the BIA will reverse IJ Baker's bond order as to Petitioner, as IJ Baker himself

26   acknowledged, based on the administration's new interpretation of § 1225(b)(2) is a foregone

27   conclusion. See Vasquez-Rodriguez v. Garland, 7 F.4th 888, 896 (9th Cir. 2021) ("We will excuse

28   a failure to exhaust if it is very likely what [the BIA's] result would have been. Thus, where the

agency's position appears already set and recourse to administrative remedies is very likely futile, exhaustion is not required.") (cleaned up) (internal citations and quotations omitted); see also Mosqueda v. Noem, No. 5:25-CV-02304 CAS (BFM), 2025 WL 2591530, at *7 (C.D. Cal. Sept. 8, 2025) (waiving exhaustion as futile because "the most recent BIA decision on this issue has adopted the legal interpretation of the new DHS policy that petitioners challenge.") (citing Hurtado).

Additionally, the Court finds that there is no mechanism to seek administrative review of the constitutionality of DHS' use of the automatic stay via C.F.R. § 1003.19(i)(2), so exhaustion would likewise be futile. The regulation on its face allows for at least 90 days of unreviewable detention. By the time the BIA resolves DHS' appeal, Petitioner will have been subject to a period of detention he asserts is unconstitutional, without judicial review or recourse. This matter thus falls squarely into the futility exception to the exhaustion requirement "carved for constitutional challenges to ... [DHS] procedures." Iraheta-Martinez v. Garland, 12 F.4th 942, 949 (9th Cir. 2021) (quoting Sola v. Holder, 720 F.3d 1134, 1135 (9th Cir. 2013) (per curiam)) (alterations in original)). That is the case for any due process challenge to detention under the INA, because the BIA has no authority to hear such a challenge. As to due process claims, for purposes of prudential administrative exhaustion, "[t]he key is to distinguish the procedural errors, constitutional or otherwise, that are correctable by the administrative tribunal from those that lie outside the BIA's ken." Sola, 720 F.3d at 1135. See also Matter of G.K., 26 I. & N. Dec. 88, 96-97 (BIA 2013) (explaining that "[n]either the [BIA] nor the Immigration Judges have the authority to rule on the constitutionality of the statutes we administer[.]"); Coyt v. Holder, 593 F.3d 902, 905 (9th Cir. 2010) (permitting judicial review of a constitutional challenge to a regulation because the BIA lacked authority over the question).

Moreover, requiring Petitioner to be subjected to unlawful detention pending the BIA's decision would cause irreparable harm, which is a separate and independent basis to waive exhaustion under Laing. 370 F.3d at 998; see also Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013) (finding irreparable harm in continued detention of noncitizens who would likely be granted conditional release if afforded a bond hearing).

In sum, because Petitioner's constitutional challenge to his detention is necessarily beyond the scope of the BIA's review, the BIA has already adopted DHS' new interpretation of the § 1225(b)(2)(A), and awaiting the BIA's decision would result in irreparable harm to Petitioner, prudential administrative exhaustion—to the extent it should apply where DHS, not Petitioner, has appealed the bond decision of an IJ—is excused as futile.

The Court next turns to the bases for Petitioner's challenge to the lawfulness of his detention.

### C. Due Process

Petitioner asserts his ongoing detention pursuant to the automatic stay 8 C.F.R § 1003.19(i)(2) violates his procedural and substantive due process rights.

The Due Process Clause prohibits deprivations of life, liberty, and property without due process of law. See U.S. CONST., amend. V. There is no question that these protections extend to noncitizens present in the United States. See, e.g., Trump v. J.G.G., 604 U. S. ___, 145 S. Ct. 1003, 1006 (2025) (per curiam) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings . . .") (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)); Zadvydas v. Davis, 533 U.S. 678, 693, (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); Hussain v. Rosen, 985 F.3d 634, 642 (9th Cir. 2021) (holding the "Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

Noncitizen detainees charged with being in the U.S. illegally are entitled to procedural due process, meaning "notice and opportunity to be heard 'appropriate to the nature of the case.'" J.G.G., 145 S.Ct. at 1006; see also A. A. R. P. v. Trump, 145 S. Ct. 1364, 1367 (2025). Due process "is a flexible concept that varies with the particular situation." Zinermon v. Burch, 494 U.S. 113, 127 (1990). "[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process." Hernandez v. Sessions, 872 F.3d 976, 981 (9th Cir. 2017).

Substantive due process protects individuals from government action that interferes with fundamental rights. See Regino v. Staley, 133 F.4th 951, 959-60 (9th Cir. 2025). "Governmental action that infringes a fundamental right is constitutional only if 'the infringement is narrowly

tailored to serve a compelling state interest.'" Id. at 960 (citing Reno, 507 U.S. at 302). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process Clause] protects." Zadvydas, 533 U.S. at 690. Substantive due process thus protects noncitizens from arbitrary confinement by the government, which violates a noncitizen's substantive due process rights except in certain "special and narrow nonpunitive circumstances where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." Id. at 690 (internal quotations omitted) (quoting Foucha v. Louisiana, 504 U.S. 71, 80 (1992); Kansas v. Hendricks, 521 U.S. 346, 356 (1997).

### i. *The Statutory Question*

When this Court first had the occasion to consider a due process challenge to detention pursuant to the automatic stay under 8 C.F.R. § 1003.19(i)(2), the BIA had not yet adopted DHS' new mandatory detention policy in Hurtado. See Herrera v. Knight, —— F.Supp.3d ——, No. 2:25-CV-01366-RFB-DJA, 2025 WL 2581792, at *6-7 (D. Nev. Sept. 5, 2025). The Court found the petitioners' detention presented "the narrow question of the lawfulness of DHS' invocation of the automatic stay pursuant to 8 C.F.R. § 1003.19(i)(2)," and thus declined "at [that] time" to decide "the merits of DHS' statutory argument or its likelihood of success before the BIA." Id. at *7. Hurtado was issued shortly after this Court's decision in Herrera, and the Court has since grappled extensively with and rejected the government's new interpretation of the interplay between § 1225(b)(2)(A) and § 1226(a). See Vazquez v. Feeley, No. 2:25-CV-01542-RFB-EJY, 2025 WL 2676082 (D. Nev. Sept. 17, 2025).

To the extent Respondents assert they have the authority to continue to detain Petitioner under § 1225(b)(2)(A) pursuant to Hurtado, the Court finds his detention on that basis is unlawful, for the same reasons the Court previously rejected the government's statutory argument, which the Court incorporates by reference. Vazquez, 2025 WL 2676082, at *11-16. Similarly, this Court holds that Hurtado does not deprive IJ Baker of the authority to grant bond to Petitioner, and his bond release order, based on a finding that Petitioner is detained under § 1226(a), is not superseded by that erroneous decision.

1    The Court notes, however, and Respondents' argue before this Court and in their appeal of

2    IJ Baker's bond decision to the BIA, that Petitioner's status in light of his initial interception at the

3    border and discretionary release on parole, which expired in December 2022, raises a separate

4    statutory question this Court has not previously addressed: whether Petitioner's re-detention in

5    2025, years after his parole expired, renders him an "applicant for admission" under § 1225(b),

6    according to 8 U.S.C. § 1182(d)(5)(a), which states that upon expiration of parole a noncitizen

7    "shall forthwith return or be turned to the custody from which he was paroled . . . and continue to

8    be dealt with in the same manner as that of any other applicant for admission."

9    The Court finds, however, that it need not decide this statutory question to resolve

10    Petitioner's due process challenge to his ongoing detention. The central inquiry for the Court is

11    whether Petitioner's re-arrest and detention without the opportunity for release on bond satisfies

12    due process. The Ninth Circuit has essentially reached this same conclusion in grappling with a

13    challenge to mandatory detention under § 1225(b) in Rodriguez v. Marin, 909 F.3d 252 (9th Cir.

14    2018). In Rodriguez, the Ninth Circuit stated: "We have grave doubts that any statute that allows

15    for arbitrary prolonged detention without any process is constitutional or that those who founded

16    our democracy precisely to protect against the government's arbitrary deprivation of liberty would

17    have thought so. Arbitrary civil detention is not a feature of our American government." Id. at

18    256–57.

19    Accordingly, even if Petitioner's detention is mandated by his perpetual status as an

20    "applicant for admission" due to his initial parole (which the Court doubts is a reasonable

21    interpretation of the relevant statutory provisions), the Court must still consider whether his re-

22    arrest and detention satisfies due process. For the following reasons, the Court finds it does not.

23    **ii.  *Procedural Due Process***

24    To determine whether detention violates procedural due process, courts apply the three-

25    part test set forth in Mathews v. Eldridge, 424 U.S. 319 (1976). See Rodriguez Diaz v. Garland,

26    53 F.4th 1189, 1206 (9th Cir. 2022) (collecting cases and applying the Mathews test in similar

27    immigration detention contexts).

28    Under Mathews, the Court weighs the following three factors: (1) "the private interest that

will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335.

### 1. The Private Interest

The first Mathews factor considers the private interest affected by DHS' invocation of the automatic stay to continue to detain Petitioner. See Mathews, 424 U.S. at 335. Here, that is Petitioner's interest in being free from imprisonment, "the most elemental of liberty interests." Hamdi, 542 U.S. at 529. In this country liberty is the norm and detention "is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987); see also Rodriguez Diaz, 53 F.4th At 1207 ("An individual's private interest in freedom from prolonged detention is unquestionably substantial.") (citations omitted).

Petitioner has a fundamental interest in freedom from physical confinement, and that liberty interest is particularly strong given his initial release from detention in 2022, and the fact that Respondents did not seek his return to custody upon the expiration of his parole in December 2022, or in the three years since. Courts in the Ninth Circuit have consistently found that the government's decision to release an individual creates "'an implicit promise' that the individual's liberty will be revoked only if they fail to abide by the conditions of their release." See Ramirez Tesara v. Wamsley, ─── F.Supp.3d ───, No. 2:25-CV-01723-MJP-TLF, 2025 WL 2637663 (W.D. Wash. Sept. 12, 2025) (collecting cases). "When he was released from his initial detention on parole, Petitioner took with him a liberty interest which is entitled to the full protections of the due process clause." Id. (citing Doe v. Becerra, No. 2:25-CV-00647-DJC-DMC, ─── F.Supp.3d ───, 2025 WL 691664, at *5 (E.D. Cal. Mar. 3, 2025) ("The Supreme Court has repeatedly recognized that individuals who have been released from custody, even where such release is conditional, have a liberty interest in their continued liberty.").

That the express terms of Petitioner's parole allowed for discretionary termination or expiration does not somehow obviate the need for the government to provide an individualized

hearing prior to re-detaining him given the significance of his liberty interest. See Pinchi v. Noem, No. 5:25-CV-05632-PCP, ——— F.Supp.3d———, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025) ("[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody") (collecting cases).

Petitioner's actions since his initial release further weigh strongly in favor of his liberty. His interest in being free from confinement is particularly weighty, given his family and community ties within this country. What is more, IJ Baker has found he is eligible to gain status as a lawful permanent resident under the Cuban Adjustment Act—which Respondents assured this Court is a determination DHS did not contest. Indeed, the relevant parole statute specifically provides that Petitioner has special status as a Cuban national—which Respondents fail to acknowledge. See 8 C.F.R. § 212.5(g). Respondents have presented no evidence or argument suggesting Petitioner is not entitled to lawful status consistent with the preliminary determination of IJ Baker.

Further, Respondents parole expiry argument does not explain why they found Petitioner to be eligible for parole in December 2022, but not in July 2025, after he had established deep ties to the community, maintained employment, his wife and children were granted status as lawful permanent residents, and he timely pursued adjustment of status. See, e.g., Ramirez Tesara, 2025 WL 2637663 at 7; Y-Z-L-H v. Bostock, No. 3:25-CV-965-SI, ———F.Supp.3d ———, at *14 (D. Or. July 9, 2025) (noting that such discrepancy may be considered an arbitrary and capricious decision, subject to challenge under the Administrative Procedures Act).

The first Matthews factor thus weighs strongly in favor of Petitioner.

## 2.  The Risk of Erroneous Deprivation

The second Mathews factor is "the risk of an erroneous deprivation of [Petitioner's] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." Mathews, 424 U.S. at 335. As applied, this Court finds Respondents' use of the automatic stay to continue to detain Petitioner, after he was found to be neither dangerous nor a flight risk, creates an extreme risk of erroneous and arbitrary confinement. Moreover, as this Court

has previously found, the risk of erroneous deprivation of a noncitizen's liberty interest when DHS invokes the automatic stay is extraordinarily high in all circumstances. Herrera v. Knight, 2025 WL 2581792, at *10 (finding the automatic stay violates procedural due process both facially and as applied to noncitizens detained pursuant to the government's new statutory reading) (citing Günaydin v. Trump, No. 25-CV-01151 (JMB/DLM), 2025 WL 1459154 (D. Minn. May 21, 2025); accord Silva v. Larose, No. 25-CV-2329-JES-KSC, 2025 WL 2770639 (S.D. Cal. Sept. 29, 2025); Quispe-Ardiles v. Noem, No. 1:25-CV-01382-MSN-WEF, 2025 WL 2783800, at *9 (E.D. Va. Sept. 30, 2025); Garcia Picazo v. Sheenan, No. C25-4057-LTS-MAR, 2025 WL 3006188 (N.D. Iowa Oct. 27, 2025); Maza v. Hyde, No. 1:25-CV-12407-IT, 2025 WL 2951922 (D. Mass. Oct. 20, 2025)

The risk of erroneous deprivation of a noncitizen's liberty interest when DHS invokes the automatic stay is extraordinarily high for a few reasons. First, the text of the regulation provides no identifiable standard that would guide any formal due process procedures. See 8 C.F.R. § 1003.19(i)(2). The regulation simply states that it may be invoked "[i]n any case in which DHS has determined that an alien should not be released or has set a bond of $10,000 or more." Id. Such an undefined and subjective standard clearly creates a likelihood of arbitrary and capricious application. Second, the automatic stay is necessarily invoked only after an IJ has already granted release, after an evidentiary hearing, wherein it was established that the noncitizen is not a flight risk or dangerous. As such, the stay is effectively a unilateral automatic stay pending appeal as of right afforded to the losing party—the very agency official who failed to present evidence or argument sufficient to convince a neutral decisionmaker that detention is warranted.

Additionally, the regulation facially provides no discernable standard to guide the relevant agency official's decision to enact the automatic stay, other than the vague requirement that the stay be invoked pursuant to some unspecified internal procedures established by DHS, and certified to be warranted under the facts and law by an official. The Court finds this unchecked power vested in DHS to prolong an individual's detention cannot in any circumstance be a "carefully limited exception" to an individual's right to liberty as required by the Due Process Clause. See Salerno, 481 U.S. at 755.

Moreover, this unilateral stay stands in contrast to the ordinary requirements of overriding a judge's order pending appeal, which requires a showing of, *inter alia*, a likeliness of success on the merits of the appeal and irreparable injury in the absence of a stay. See Nken v. Holder, 556 U.S. 418, 426 (2009). The automatic stay thereby presents a conflict of interest in conferring unreviewable adjudicatory authority in a prosecuting agency official that makes erroneous deprivation not just a risk, but likely. See e.g., Günaydin, 2025 WL 1459154 at *8 ("the challenged regulation permits an agency official who is also a participant in the adversarial process to unilaterally override the immigration judge's decisions . . . [and] is anomalous in our legal system . . .); Zavala v. Ridge, 310 F.Supp.2d 1071, 1078 (N.D. Cal. 2004) (holding the automatic stay creates a serious risk of error because it conflates the functions of adjudicator and prosecutor); Ashley v. Ridge, 288 F. Supp. 2d 662, 670–71 (D.N.J. 2003) ("the automatic stay provision . . . was enacted precisely to avoid the need for. . . individualized determination[s]. Aliens like Petitioner can consequently remain in detention no matter how frivolous the appeal by the Government."); Reynosa Jacinto v. Trump, 4:25-cv-03161-JFB-RCC at *7 (D. Neb. August 19, 2025) (same).

Finally, and importantly, with regards to the discretionary grant of parole under 8 U.S.C. § 1182(d)(5)(A), neither the statutory provision or its enacting regulations provide any procedure for a noncitizen to challenge the revocation or expiration of parole as based on an erroneous factual or legal predicate, as unreasonable, or as otherwise in violation of statutory and regulatory requirements. See 8 C.F.R. § 212.5(e). Pursuant to regulation, where, as here, parole is terminated automatically upon an expiration date, if the previously paroled noncitizen cannot be excluded, deported, or removed "within a reasonable time," the noncitizen "shall again be released on parole unless in the opinion of the official . . . the public interest requires that the alien be continued in custody." Id., § 212.5(e)(1)-(2)(i). However, there is no mechanism for a noncitizen parolee to challenge the official's decision to return him to custody by ensuring either that his removal will be executed within a reasonable time or that the official had a reasonable basis for deciding that the public interest requires his continued detention. Moreover, if the official made a mistake as to the identity of a noncitizen or as to facts erroneously applied to the noncitizen as a predicate for

re-detaining a parolee, there is no mechanism for knowing and challenging the basis of that decision. In other words, while the automatic stay affords a DHS official the ability to stay the bond decision of an IJ as legally or factually erroneous pending judicial review, no such mechanism exists for a noncitizen whose humanitarian parole is revoked or expires to stay or seek review of a DHS official's decision to re-arrest and detain them. This means that a noncitizen like Petitioner has no recourse to challenge re-detention after parole revocation as based upon an erroneous or mistaken factual or legal predicate, or as otherwise arbitrary.

With regards to the probable value of additional procedure, it is not difficult to conclude that additional procedure is valuable where the only procedure required for continued detention appears to be an unreviewable decision by an agency official based on a vague and undefined standard subject to no formal procedures or review. Accordingly, the second Mathews factor also weighs heavily in favor of Petitioner.

### 3.    The Government's Interest and Burden of Additional Process

The third and final Matthews factor considers, the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. Respondents assert that the government's compelling interest in steady enforcement of immigration laws and preserving the BIA's authority without judicial intervention warrants denying the Petition. The Court acknowledges that the Government's interests in "protecting the public from dangerous criminal aliens" and "securing an alien's ultimate removal" are "interests of the highest order." Rodriguez Diaz, 53 F.4th at 1188-89. The Court finds, however, that these interests are in fact protected by the individualized determination by an IJ as to whether an individual should be granted bond at all under existing, well-established procedures. In failing to articulate any individualized reason why detaining Petitioner is necessary to enforcing immigration law, the question arises "whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." Demore v. Kim, 538 U.S. 510, 532–33 (2003) (Kennedy, J., concurring).

Respondents have identified no legitimate interest that would support the specific detention of Petitioner despite the IJ's finding that he is not dangerous or a flight risk, and that he is eligible

for adjustment of status. Nor have Respondents claimed that releasing Petitioner would present an administrative or financial burden. The third <u>Matthews</u> factor therefore also weighs heavily in Petitioner's favor and against the government.

In sum, the Court finds Petitioner's continue detention, with no process afforded to challenge it as arbitrary, violates his procedural due process rights.

### iii.  *Substantive Due Process*

Government detention violates the Due Process Clause unless it is ordered in a criminal proceeding with adequate procedural protections, or in non-punitive circumstances "where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." <u>Zadvydas</u>, 533 U.S. at 690.

The regulation at issue, which has permitted unilateral government detention of Petitioner after a reasoned finding that he does not pose a threat to safety or a risk of flight, clearly violates substantive due process, because the government has asserted no special justification that outweighs Petitioner's constitutionally protected liberty interest. <u>See</u> <u>Zadvydas</u>, 553 U.S. at 691-92 ("once the flight risk justification evaporates, the only special circumstance [ ] present is the alien's removable status itself, which bears no relation to a detainee's dangerousness."). To the contrary, Respondents conceded to this Court that Petitioner is *not* removable, and that removal proceedings would accordingly be resolved in his favor in a matter of weeks. Yet Respondents asserted this Court should abstain from intervening while removal proceedings conclude, because Petitioner would be released in a couple of weeks anyway. Respondents thereby admitted that Petitioner would continue to be deprived of his liberty until then for no apparent reason. Such indifference from the executive branch to the Constitution's guarantee of freedom from arbitrary detention is grave cause for concern. Respondents here have not articulated *any* individualized interest—let alone a compelling interest—to justify Petitioner's continued detention. Accordingly, this Court further finds that Petitioner is currently detained in violation of his substantive due process rights.

Because the Court finds Petitioner's continued detention pursuant to the automatic stay is unconstitutional, the Court grants the Writ of Habeas Corpus and orders his immediate release

pursuant to the bond conditions imposed by IJ Baker.[7]

### V.   CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Petitioner Rodriguez Cabrera's Petition for Writ of Habeas Corpus is **GRANTED**. Respondents are **ORDERED** to release Petitioner from custody by **2:00 p.m. on November 4, 2025**. Petitioner shall be subject to the bond and other conditions imposed by the IJ. Respondents are **ENJOINED** from re-detaining Petitioner in connection with his current removal proceedings without an individualized bond hearing.

**IT IS FURTHER ORDERED** that Petitioner must satisfy the bond conditions to the extent they are still applicable by **November 21, 2025**. If Petitioner's status is adjusted, the parties may file a joint request to modify this order as to the satisfaction of the bond conditions, as they would become moot.

**IT IS FURTHER ORDERED** that the parties shall file a joint status report on or before **November 6, 2025** confirming that Petitioner has been released in compliance with this Order.

**DATED:** November 3, 2025.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

---

[7] Because the Court grants relief on due process grounds, it need not reach Petitioner's first claim, that the automatic stay is *ultra vires*. The Court however joins others that have expressed concern that DHS officials have exceeded their authority delegated by Congress under the INA by unilaterally using the automatic stay to enforce its new statutory interpretation where IJs have rejected it. See, e.g., Günaydın, 784 F. Supp. 3d at 1184, n. 7; Garcia Picazo, 2025 WL 3006188, at *5 (finding the automatic stay amounts to DHS acting without congressional authority, where the INA delegates authority to the Attorney General and IJs which work within the Department of Justice, whereas DHS is a separate administrative agency) (citing Jacinto v. Trump, No. 4:25CV3161, 2025 WL 2402271 (D. Neb. Aug. 19, 2025).